UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MANSOUR MERRIKHI NASRABADI, | |
| Plaintiff, | No. 18 C 8514 |
| v. | Judge Thomas M. Durkin |
| TAHER KAMELI, | |
| Defendant. | |

MEMORANDUM OPINION AND ORDER

Mansour Nasrabadi brings malpractice and breach of fiduciary duty claims against his former attorney Taher Kameli. Kameli has moved for summary judgment. R. 128. That motion is granted.

**Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). The Court does not "weigh conflicting evidence, resolve swearing

contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 2021 WL 4486445, at *1 (7th Cir. Oct. 1, 2021). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Background

The EB-5 visa program enables foreign nationals to qualify for permanent U.S. residency (known as a "green card") by investing at least $500,000 in a qualified investment enterprise. Nasrabadi is from Iran. Kameli is an attorney who both represents clients in the EB-5 application process and establishes and manages qualified investment enterprises.

The parties agree that Nasrabadi learned about Kameli's combination of services by watching a program Kameli broadcast on Iranian television. They also agree that Kameli suggested that Nasrabadi invest in a fund controlled by Kameli (the "Fund") which would then loan money for the construction of an assisted living facility owned by Kameli (the "Facility"). Nasrabadi invested $500,000 in the Fund on the understanding that the money would be loaned to the Facility for its construction.

Despite this agreement as to the broad strokes of their relationship, Kameli and Nasrabadi disagree about the details of their communications. According to Nasrabadi, he first spoke to Kameli over the phone, and Kameli told him that Kameli would serve as his "immigration attorney and manage and assist the construction

2

and operation of [the Facility]." *See* R. 141 at 3 (¶ 141). Kameli told Nasrabadi that the Fund needed "one more" investor to reach the necessary $8.5 million to construct the Facility, and that Nasrabadi's $500,000 investment would mean that the Facility was "almost fully funded." *See id.* at 2 (¶ 3), 3 (¶ 4). Kameli mailed Nasrabadi an engagement letter, which Nasrabadi "understood to be [Kameli's] agreement to advise and assist [Nasrabadi] as to the investment of the $500,000, which he in fact did, as well as handling the immigration petition." R. 136 at 3 (¶ 5). The representation agreement referenced the $500,000 investment and required that fees be paid to both Kameli and the Fund before Kameli's representation would commence:

> Attorney has told Client that Client needs to pay a management fee to the fund which varies according to each fund. Client understands that Client must transfer the $500,000 . . . plus the management fee to the Regional Center bank accounts before Attorney sends Client's case to United States Citizenship and Immigration Services.

R. 136-1 at 2 (§ A).[1] According to Nasrabadi, Kameli claimed that Kameli's "participation in the management . . . would help assure the success of the business." R. 136 at 2 (¶ 3). Further, according to Nasrabadi, Kameli told him "that because [Kameli] was personally involved in the management of [the Fund] and [the Facility]," Nasrabadi could "rely on [Kameli] to look out for [Nasrabadi's] best interests." *Id.* at 3 (¶ 5).

---

[1] The agreement also provided that Kameli's fee for his legal services was $50,000. *See* R. 136-1 at 2 (§ B).

3

The representation agreement, however, further explains that Kameli's interest in the Fund and the Facility could conflict with Nasrabadi's interests:

> Client understands the Taher Kameli, the principal and sole owner of the Firm, may have interests financial or otherwise in certain Regional Centers and/or projects associated with these certain Regional Centers. If such a conflict exists, Client will be required to sign a "Waiver of Conflict of Interest" which will acknowledge that the Firm has disclosed all conflicts and that Client waives such conflicts and still wishes to retain the Firm. Client acknowledges that despite such conflicts, the Firm continues to be bound to protect Client's interest and will always work to obtain the best results for Client, but that because of such conflicts the Firm at times may not be in a position to make the decision in the best interest of Client and may at times be influenced by their own interests. Such conflicts _may_ at times affect the professional judgment [of] the Firm in the course of Client's representation. **Client is free to seek independent counsel to review this contract or any other agreement prior to entering into said contract or agreement, and will be afforded a reasonable opportunity to seek such independent legal counsel.**

R. 136-1 at 3-4 (§ G) (emphases in original).

Kameli and Nasrabadi eventually met in person to sign the representation agreement. But despite this meeting and the provisions in the agreement describing Kameli's conflict of interest, according to Nasrabadi, "[n]either Kameli nor anyone from his office ever discussed with [him] the various risks that reliance upon Kameli alone as our counsel posed to us in light of his conflicts of interest." *See* R. 136 at 3 (¶ 5). Further, Nasrabadi says that Kameli did not "explain any of the terms of the representation letter, the nature and extent of the risks the letter imposed . . . or the importance of seeking independent counsel." R. 136 at 2-3 (¶ 4).

Prior to signing the representation agreement, Nasrabadi claims that Kameli specifically told him that the investment would be "secured by a first mortgage lien on all the assets of [the Facility]." *See* R. 136 at 4 (¶ 7). Kameli does not dispute this. *See* R. 129 at 24. It is also undisputed that the Facility never granted a first priority security to the Fund. *Id.*; *see also* R. 130-1 at 16 (58:17-20, 59:24–60:5) (Kameli's testimony). Because Kameli controlled both the Fund and the Facility, the failure to ensure that the security interest was granted is entirely Kameli's fault.

Nasrabadi learned about the lack of a first priority security no later than October 8, 2013 when he signed an acknowledgement of receipt of the Fund's revised private placement memorandum. *See* R. 138 at 20-23 (¶¶ 40-49). The revised private placement memorandum expressly stated that the Fund "will be granted a second priority security interest," and the Facility "is in the process of obtaining a private loan . . . which will be granted a first priority security interest." *Id.* at 22 (¶ 47)

Eventually in 2015, the Facility required additional investment. It secured a bank loan and granted the bank a first priority security. The subordination agreement associated with the bank loan notes that the Fund's loan (including Nasrabadi's investment) to the Facility was unsecured. *See* R. 137-1 at 22 (¶ 2.2, p.3) ("There are no security interests, liens, encumbrances and claims whether now existing which in any way secure the payment of [the Fund's debt]."). At this point, Nasrabadi and the Fund's other investors were given the opportunity have their

5

investments returned. Nasrabadi declined, presumably because the investment was the basis for his green card application. *See* R. 138 at 30 (¶ 70).[2]

The source of Nasrabadi's concern with Kameli's conflicts of interest arose several years later. In 2017, the SEC brought an action against Kameli and related parties in connection with Kameli's activities with the entity through which he owns the Fund, but with respect to a different facility construction project (i.e., not the one Nasrabadi invested in). Kameli and his entity eventually settled with the SEC for a disgorgement amount of $1,172,000, plus interest, and a civil penalty of $320,000. *See SEC v. Kameli,* 17 C 4686 (N.D. Ill. Jan. 24, 2022), R. 243 at 3-4.

At the same time, one of Kameli's other immigration clients sued United States Citizenship and Immigration Services ("USCIS") for denying his green card application because it was supported by the failed project at issue in the SEC's lawsuit. Kameli represented that client in the lawsuit against USCIS. Summary judgment was granted to USCIS, and Kameli's client appealed, still represented by Kameli. On appeal, the Seventh Circuit had this to say:

> This case presents at least two concurrent conflicts of interest, neither of which can be waived by informed client

---

[2] In his most recent brief on summary judgment, Nasrabadi states that his "I-829 petition remains administratively unresolved," but "the agency has not rendered an adverse decision as to his petition and this that is not a subject to be controverted at trial." R. 150 at 1. More specifically, in response to the Court's inquiry as to whether Kameli caused Nasrabadi to not receive the immigration status he sought, Nasrabadi stated that he "does not contend that he suffered damages because of a failure to receive the permanent resident status he sought." *Id.*

6

> consent. No lawyer could reasonably continue the representation under these circumstances.
>
> First, a conflict of interest arises when an attorney has an incentive to reject lines of inquiry or argument that might help his client's case. Kameli has precisely this motivation. He and [the plaintiff] might share an interest in proving that the Elgin investment was not a sham, but that is where their alliance begins and ends. Kameli would not advise [the plaintiff] to litigate his case any other way, such as by alleging fraud and seeking reconsideration of the USCIS's decision. It therefore strains credulity to think that Kameli would be diligent in Doe's case. Indeed, a diligent lawyer must take "whatever lawful and ethical measures are required to vindicate a client's cause or endeavor." Kameli's self-interest inhibits him from carrying out this duty.
>
> Second, a lawyer owes his client a duty of "undivided fidelity." Having a duty to someone else obviously "interfere[s] with the undivided loyalty [that] the attorney owes his client" and ultimately "detract[s] from achieving the most advantageous position for his client." Kameli's divided obligations to his various investors and clients put him in precisely this position. The SEC alleges that Kameli "has remained in total control" of the relevant EB-5 projects he created. Many of these projects evidently "lack money to complete construction," meaning Kameli must decide which projects to shore up with the limited funds he has. His duty of loyalty to [the plaintiff] would require him to complete the Elgin project because that would best position him to obtain lawful permanent residence. His obligations to his other investors, on the other hand, require him to invest in their respective enterprises. This catch-22 is the epitome of divided loyalty and thus makes Kameli's continued representation untenable.

*Doe v. Nielsen*, 883 F.3d 716, 718-19 (7th Cir. 2018) (internal citations omitted).

Also in 2017 (just a month after the SEC brought its action), the bank holding the first priority mortgage loan to the Facility in which Nasrabadi invested foreclosed on it. On April 18, 2018, one of the Facility's creditors filed an involuntary Chapter

7

11 bankruptcy petition against the Facility in this district (Bankr. N.D. Ill. Case No. 18-11289).

On January 29, 2019, the bankruptcy court approved the Trustee's sale of the Facility's property for $12.7 million. *See* Bankr N.D. Ill. 18-11289, R. 148. Of that amount, $2 million were distributed to the Fund. *See* R. 137-4. Out of the $2 million, Nasrabadi recovered $100,000 of his $500,000 investment. *See* R. 136 ¶ 15. Other investor-members received the same distribution. Also, of the $2 milllion, $558,000 was distributed to Kameli's law firm and the entity through which he controlled the Fund. Nasrabadi claims that Kameli controlled the Fund's allocation of the $2 million distributed by the Trustee from the Facility's bankruptcy estate, and so the payments to his law firm and his other entity constitute impermissible self-dealing.

Nasrabadi's primary claims concern: (1) the allegation that Kameli failed to inform Nasrabadi that Kameli's conflicts were not waivable; and (2) that Kameli failed to secure the Fund's loan to the Facility, as he promised. In his brief, Nasrabadi also argues that Kameli is liable to Nasrabadi because: (3) he unduly influenced Nasrabadi to invest in the Fund; (4) he mismanaged the Fund and the Facility, causing the Facility's bankruptcy; and (5) he allocated the bankruptcy proceeds distributed to the Fund in a self-serving manner.

**Analysis**

Kameli argues that Nasrabadi's two primary claims are untimely. Illinois law provides that a claim for attorney malpractice "must be commenced within 2 years from the time the person bringing the action knew or reasonably should have known

of the injury for which damages are sought . . . . [and] may not be commenced in any event more than 6 years after the date on which the act or omission occurred." 735 ILCS 5/13-214.3. In other words, if a client's claim does not accrue until more than six-years after the attorney's act that caused the injury, the injury is not actionable because it is barred by the statute of repose.[3] However, the six-year statute of repose is tolled if the defendant "fraudulently conceals the cause of such action from the knowledge of the [plaintiff]," in which case "the action may be commenced at any time within 5 years after the [plaintiff] discovers that he or she has such cause of action." 735 ILCS 5/13-215.

## I. Conflict of Interest

Kameli's failure to inform Nasrabadi about the non-waivable nature of the conflict occurred at the outset of the representation in 2010. Under Illinois law,

---

[3] The Illinois Supreme Court explained in greater detail the interaction of the statutes of repose and limitations:

> The statute of limitations . . . incorporates the "discovery rule," which serves to toll the limitations period to the time when the plaintiff knows or reasonably should know of his or her injury. The purpose of a statute of repose . . . operates to curtail the "long tail" of liability that may result from the discovery rule. A statute of repose begins to run when a specific event occurs, regardless of whether an action has accrued. Thus, a statute of repose is not tied to the existence of any injury, but rather it extinguishes liability after a fixed period of time. The statute of repose applicable in the case at bar prohibits the commencement of an action more than six years "after the date on which the act or omission occurred."

*Snyder v. Heidelberger*, 953 N.E.2d 415, 418-19 (Ill. 2011).

9

Nasrabadi was required to bring a cause of action for this failure no later than sometime in 2016, but Nasrabadi did not file this case until 2018.

Further, the statute of repose is not tolled because Nasrabadi does not allege or argue that Kameli fraudulently concealed the unwaivable nature of his conflicts. Nasrabadi concedes that Kameli informed him of the conflict itself. Indeed, the fact that Kameli was both Nasrabadi's immigration attorney and the owner of the investment Fund and Facility was part of Nasrabadi's expectation for their relationship.

But the mere fact that a conflict existed is not the basis for Nasrabadi's claim. Rather, Nasrabadi claims that Kameli failed to inform Nasrabadi of the *unwaivable* nature of the conflict. The problem with that claim, however, is that Nasrabadi does not allege or argue that Kameli was aware that his conflict was not waivable until the Seventh Circuit made that finding in 2018. And the Seventh Circuit made this finding after Kameli's business interests had diverged from Nasrabadi's interests. Nasrabadi does not contend that his interests were directly adverse to Kameli's business interest or obligations to other clients at the outset of the representation. And it appears that the parties' interests did not become directly adverse until several years later when bank financing became necessary. Without evidence that the conflict was unwaivable at the beginning of the representation, and that Kameli was aware of its unwaivable nature at that time, he cannot have fraudulently concealed that information. And because Nasrabadi has failed to demonstrate fraudulent

10

concealment, the time for the claim to be brought cannot be tolled and it must be dismissed as untimely.

## II. First Priority Security

Kameli does not materially contest that, in 2011, he promised Nasrabadi that the Fund's loan to the Facility would be granted a first priority security, and that he (Kameli) did not ensure that such a security was granted. However, Nasrabadi did not learn this information until October 2013 (at the latest) when he acknowledged that the Fund had issued the new private placement memorandum that said the Fund would have a second priority security interest. Nasrabadi argues that Kameli intentionally concealed the fact that Nasrabadi's investment was unsecured until that time. *See* R. 135 at 13 (Nasrabadi argues that "Defendant concealed and suppressed the fact that [the Fund has not been granted a first lien security] until at least September 2013, when the amended [private placement memorandum] was issued."). Nasrabadi argues further that the fact that Kameli had the power to provide the promised security is sufficient evidence for a reasonable jury to find that Kameli intentionally concealed that information from Nasrabadi such that the statute of repose should not begin to run until October 2013.[4]

Nevertheless, this claim is still late. As discussed, Nasrabadi learned that his investment was unsecured no later than October 2013. Illinois law provides that the

---

[4] The two-year statute of limitations would not begin to run until Nasrabadi was injured, which is plausibly when the Facility was forced into bankruptcy and the Fund's lack of a first priority security interested actually injured Nasrabadi. *See Kaplan v. Shure Bros.*, 153 F.3d 413, 421 (7th Cir. 1998) ("The 'injury' that begins the limitations period is not the negligent act or omission [by the attorney], instead the

11

six-year statute of repose is tolled for five years from the date the plaintiff learns of the concealed information. Thus, Nasrabadi was required to bring his claims by October 2018. But he did not file this case until December 28, 2018, more than four months after the tolling of the statute of repose expired. Therefore, any claim based on Kameli's failure to secure Nasrabadi's investment is also time-barred.

### III. Undue Influence

Nasrabadi also argues that the Court should "unwind" all of the transactions he entered into at Kameli's behest because Kameli exercised undue influence over him as his attorney. "Due to the fiduciary duty an attorney owes a client, . . . a presumption of undue influence arises when an attorney enters into an agreement or transaction with a client after the attorney-client relationship exists and the attorney benefits from the agreement or transaction." *White v. Richert*, 2016 WL 3582083, at *3 (N.D. Ill. June 28, 2016) (citing *Bruzas v. Richardson*, 945 N.E.2d 1208, 1214 (Ill. App. Ct. 1st Dist. 2011)). But an attorney can overcome this presumption when he or she proves certain factors, including that: "(1) the attorney made a full and frank disclosure of all relevant information; (2) the client's agreement was based on adequate consideration, and (3) the client had independent advice before completing the transaction." *Bruzas*, 945 N.E.2d at 1214.

---

limitations period begins when there is a loss caused by the negligent act or omission."). Nasrabadi's complaint was filed before or within two-years of any conception of the loss caused by the bankruptcy, so that the statute of limitations is not at issue here. It is the earlier and less forgiving bar of the statute of repose that makes Nasrabadi's claim untimely.

12

Applying these factors here, a reasonable jury could not find that Kameli exercised undue influence over Nasrabadi. Nasrabadi concedes that he entered the transactions in order to qualify for a green card. Nasrabadi contacted Kameli and hired him with the expectation that their relationship involved both legal representation in the immigration process and management of the investment that provided the basis for Nasrabadi's immigration petition. Nasrabadi does not allege that Kameli convinced or persuaded him to do anything. Rather, Nasrabadi alleges that he sought out the services Kameli provided in order to legally reside in the United States. That the relationship later soured is not evidence of undue influence.

Nasrabadi also argues that Kameli intentionally misrepresented the potential costs of the Facility in order to convince Nasrabadi and others to invest. *See* R. 150 at 4-6. But this evidence ultimately boils down to the fact that the Facility cost more than Kameli predicted. Nasrabadi implies that the fact that the Facility cost nearly twice what Kameli predicted is evidence of fraudulent intent. But if the Facility costs were legitimate (and there is no evidence in the record demonstrating that they were not), the most that can be said of Kameli's poor prediction is that it was reckless or ill-advised. There simply isn't evidence that Kameli sought investors like Nasrabadi with the intention of leading them into a deal that would fail. That would be against Kameli's own financial interests.

In any event, even if Nasrabadi had demonstrated undue influence or fraudulent inducement, Kameli would have exercised this influence in 2010 and 2011 when their engagement commenced and Nasrabadi made his initial investment with

13

the Fund. As with the conflict of interest and Kameli's failure to secure Nasrabadi's investment, these actions took place more than six years ago, which is too long for Nasrabadi's complaint to be a timely assertion of a claim for undue influence at that time.

## IV. Bankruptcy

In addition to claims concerning the commencement of his relationship with Kameli, Nasrabadi makes claims concerning Kameli's subsequent actions leading to, and in the wake of, the Facility's bankruptcy. Nasrabadi argues that Kameli mismanaged the Fund and the Facility, which led to the Facility's bankruptcy, and that Kameli allocated the proceeds the Fund received from the Facility's bankruptcy in a self-serving manner. These claims were not explicitly stated in Nasrabadi's complaint, but he argued them in his brief, and they are based on facts alluded to in the complaint that are no surprise to Kameli.

The first of these new claims is that Kameli breached his fiduciary duty to Nasrabadi by managing the Fund and the Facility for his own pecuniary gain by causing the bankruptcy so as not to have to repay investors like Nasrabadi. *See* R. 135 at 13 (Nasrabadi argues in his brief that "the harmful act occurred when the lawyer violated that covenant and representation, when the first mortgage was given to West Suburban Bank in June 2015. . . . The damage or harm from that act accrued when AMC defaulted and lost the property, which happened in the course of the AMC

14

bankruptcy."); R. 135 at 15 (he argues further that the "bankruptcy claims file illuminates the self-dealing of Kameli in handling the investor funds.").

In making his argument that Kameli intentionally caused the bankruptcy, Nasrabadi relies primarily on a report from USCIS explaining why it revoked EB-5 certification from Kameli's projects. The report notes that there is no "credible explanation" for the cost overages and delays experienced by Kameli's projects. The report also finds that there was not "adequate oversight over the capital investment" involved in Kameli's projects. Nasrabadi also reviews the bids for construction costs of the Facility and argues that Kameli knew the Facility was underfunded, and thereby surmises that Kameli must have intended the Facility to fail. *See* R. 150 at 4-6. The report's findings and facts about Kameli's assessment and statement about the cost of the Facility reflect poorly on Kameli to say the least.

Despite Nasrabadi's contention, none of this evidence supports Nasrabadi's theory that Kameli had an intent to cause the Facility's bankruptcy. At worst, there is evidence of reckless mismanagement. The report merely finds fault with Kameli's management in the context of EB-5 certification. Again, the report does not contain any evidence that Kameli intended to bankrupt the Facility.[5] And evidence that Kameli underestimated the cost of the Facility is not evidence that he intended it to fail in order to defraud the Fund's investors. Nasrabadi's argument boils down to the allegation that Kameli overleveraged the Facility "increasing the likelihood of default

---

[5] Kameli did not cause the Facility to declare bankruptcy; a creditor filed an involuntary petition.

15

and failure of the business." R. 135 at 22. But there is no evidence that Kameli did this with the intent to profit on the backs of his investor-clients like Nasrabadi. In addition to failing to secure the Fund's loan to the Facility, Kameli appears to have mismanaged the Facility's construction and to have been reckless with its funds. It also appears that he structured the Fund and Facility's financing so as to insulate himself from any potential losses. But there is no evidence that he acted this way with the intent to cause the Facility to fail and that his investor-clients would lose their investment. At bottom, there is no evidence that Kameli made more money from the Facility's failure than he would have made had it succeeded. Without such evidence, there is no reason to suspect that Kameli intended to bankrupt the Facility. Thus, Nasrabadi has insufficient evidence for a reasonable jury to find that Kameli breached any duty to Nasrabadi in his management of the Fund and the Facility.

Furthermore, to the extent Kameli's mismanagement of the Fund and the Facility breached a duty he had to Nasrabadi, that duty most directly derives from the relationship they had as business partners, not their attorney-client relationship. For instance, the Illinois Limited Liability Company Act provides that members of an LLC (and the Fund was structured as an LLC) owe each other the duty of loyalty and the duty of care as described by the Act. *See* 805 ILCS 180/15-3(a). But Nasrabadi does not address this statute in his briefs, nor any similar authority that could provide the terms of a duty to Nasrabadi that Kameli breached. Nasrabadi is not from the United States, but he is a sophisticated businessperson. He is also represented by sophisticated counsel in this case. If Nasrabadi meant to bring a claim based on

16

the Illinois Limited Liability Company Act or some other source of duty beyond his attorney-client relationship with Kameli, he should have said so in his briefs (and he filed three on this motion).

Even if the Court were to generously construe Nasrabadi's arguments and claims to imply a source of duty like the Illinois Limited Liability Company Act, he has not addressed the factual circumstances that would be relevant to such a claim. Nasrabadi's relationship with the Fund is governed by contract; so is Kameli's. Whether Kameli breached a duty to Nasrabadi must be analyzed in light of those contractual obligations. The contracts might not provide the full extent of Kameli's duties (especially since he was the attorney who executed those contracts). But the contracts at least provide the context in which Kameli's duties arose. Nasrabadi's arguments never reference any such contractual duties. Without such argument, it is impossible for the Court to determine whether a reasonable jury could find that Kameli breached any duty to Nasrabadi. *See Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 704 (7th Cir. 2010) ("[I]t is not this court's responsibility to research and construct the parties' arguments, and conclusory analysis will be construed as waiver.").

Even if the evidence in the record is sufficient to establish that Kameli breached a duty to Nasrabadi, he has not identified what that duty might be. And having failed to identify a relevant duty, Nasrabadi has not shown that the evidence demonstrates a violation of any duty. By not analyzing the evidence according to the elements of any legally cognizable duty, he is unable to satisfy his burden to avoid

17

summary judgment. *See Transamerica Fin. Servs., Inc. v. Sykes*, 171 F.3d 553, 555 (7th Cir. 1999) ("It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, *legal* or factual, why summary judgment should not be entered.") (emphasis added); *see also Grillo v. Metro. Water Recl. Dist. of Greater Chi.*, 2020 WL 5642947, at *13 (N.D. Ill. Sept. 22, 2020) (granting summary judgment on a claim based on an undeveloped legal theory, even though it was based on a well-developed factual record).

## V.     Allocation of Bankruptcy Proceeds

This analysis is equally applicable to Nasrabadi's final argument that Kameli breached his duty to Nasrabadi in allocating the Fund's proceeds from the Facility's bankruptcy. The bankruptcy proceedings resulted in $2 million being distributed to the Fund, which is controlled by Kameli. Nasrabadi received $100,000 from this distribution. Kameli's law firm and the entity through which he controlled the Fund received $558,000. *See* R. 137-4. Nasrabadi argues that this allocation constitutes self-dealing by Kameli to Nasrabadi's detriment.

Again, Nasrabadi cites no authority setting forth the duty Kameli had with respect to allocation of the bankruptcy proceeds. Not only does Nasrabadi not cite any case law relevant to determining the scope of such a duty, Nasrabadi does not discuss the contracts governing the Fund. The Court presumes that the contracts governing the investors' relationship to the Fund are relevant to the proper disposition of its assets, and Kameli's duties in that regard. By not presenting any basis to establish that Kameli's fiduciary duty extended to disposition of the Fund's assets, and how

any such duty should have resulted in an allocation of assets more favorable to Nasrabadi, summary judgment must be granted to Kameli on any claim based on such an alleged duty.

## Conclusion

Therefore, Kameli's motion for summary judgment [128] is granted.

ENTERED:

*Thomas M Durkin*

Honorable Thomas M. Durkin
United States District Judge

Dated: February 22, 2023